17-27-12, Williams-McDonald v. D. Carpenter Counsel, you may proceed. Thank you. Good afternoon. My name is Kevin Buehler. I'm here on behalf of the full design division. We're here about three consolidated cases involving three separate accidents with three distinct and separate injuries. Petitioner was a heavy equipment operator for this case, probably for 32 years. And he had these separate injuries to separate parts of the body. The Commission reviewed those injuries and awarded separate decisions in two of those cases, and then found that the third injury to the shoulders that was sustained by Petitioner, that that arose out of the vocational efforts, and awarded a separate injury for a hand, a wrist, awarded an 81 award, and then found that the injuries to the shoulders were not separate from a separate or distinct injury. The circuit court then, as a matter of law, said that those cases should have been awarded one award for all of those cases. That's an error, and that's an error because each of these cases involves separate parts of the body. They involve both shoulders of the neck, the wrist, and the elbow. And under the theory of the case, when he has separate parts of the body, separate injuries, the Commission is proper to award separate and distinct awards. So did he have two separate and distinct injuries to his right elbow? Did he have separate and distinct injuries to his right elbow? The Commission found that he did. Okay, and those were consolidated for hearing, correct? They were. So under Baumgartner, and I'm sure you're familiar with that, in the statutory language, is the claimant entitled to receive benefits under both Section 8D1 and Section 8C? He can get both? In Baumgartner, there was a factual determination that there was no way to determine what part of the injuries were a result of the first accident, and then there was an intervening accident, and then the third accident. And so the court found that they could not make a determination of what those separate and distinct injuries and the permanency from them were, those all involved in the injury. And so that was the determination that the court made. Here, we don't have that. Here, the Commission was able to make a separate and distinct award for those first two injuries. And so based on that, for the circuit court to come in and say, well, as a matter of law, I'm going to reverse the Commission's decision, I think that's error under both Baumgartner as well as City of Chicago and Deerfield. Each one of those came from the proposition, well, you cannot make that determination. Then one award is appropriate. But that's not what happened in this case. Well, what was the language here that they specifically could partial out and delineate the specific injury caused by the two separate accidents? Where is it? You asked these things to be consolidated, right? I did. Okay. I did. So how does the evidence here comply? I think we're consolidated without objection. So how does the evidence comply with the Baumgartner decision here? Well, the other question is, is it a manifest way, was it against a manifest way for the Commission to award them? And the separate and distinct issue is we did have testimony, we did have medical records from the treating doctors as well as Section 12 examiners that did delineate different injuries and different restrictions to be put on the petitioner from the separate injuries. So in this case, are you saying that the Commission specifically delineated and apportioned the nature and extent of permanency attributable to each accident? Is that exactly what they did here? Well, I think they did. They made an award of 30 percent and 20 percent for the elbow and the hand, and then they made a separate award for the injuries as a result of the motor vehicle accident in which that petitioner had separate and distinct restrictions and placed a wage differential award. So I do think they did make that determination. The question then becomes, was that against the manifest way? And the court certainly didn't make that finding. They simply said as a matter of law, only one award is appropriate. Now, that comes to the second, the award of a wage differential. What happened in this case is the city of Chicago provided vocational rehabilitation benefits and paid maintenance for seven years. In May of 2012, the city simply stopped paying maintenance benefits, and they said, well, we offered you a job back in August of 2011. So the question then becomes, all right, well, if you make an offer of a job, where is the letter that says, hey, congratulations, here's a job? Where is the offer from anyone in the city of Chicago that says, hey, I gave the offer to you, great, come on in, we've got a job for you? There's nothing in the record to support such a job offer because it's just not there. They never did make a job offer. And so we had two issues. One, was there a job offer made? And no one testified that there was. And the second thing is, is the job offer of a watchman appropriate under this man's restrictions and this man's vocational abilities? And the commission found that it was. They determined he was presented with a job, a bona fide job offer for the watchman position. That was their finding, right? They absolutely did. They made the finding that there was a job offer made, and they also in their decision said the city of Chicago presented a testimony that the job offer was appropriate. And that was Pack and Mish? Well, that's what they didn't say who exactly they were relying on.  And didn't the claimant himself tell Doctors Medea and Boyd that he had been offered the job? He said he went to the doctor. The record says there is a, he's here to determine whether or not this is an appropriate job. Right, but now he obviously couldn't be there saying that if he wasn't. No dispute. And we have Petitioner 119 that was presented at the time of trial, which were letters from counsel for the city of Chicago indicating that they discussed the possibility of Petitioner returning to work with the city of Chicago within his restrictions as a night watchman. This was in November 28th of 2011. We did discuss the possibility of him returning to work. There was never an offer of him returning to work. Didn't Pack testify that the watchman position would have been his if he would have completed the process? And she explained that to him? No. What she specifically testified to was that she offered, what she called I should say, 50 individuals for 10 open positions and invited all of them to apply. And so in this case, Petitioner said, I would like to go see my doctor. And we have letters from the counsel for the city saying, that's okay, we're going to approve that. And then once that process was done, they said, we don't have those positions available anymore. And so the question then becomes, what happened to the other 40 people who were invited to apply for a position? Because there's only 10 spots. Does that mean all of those people were offered a job? Because if that's the case, were they all cut off from teaching? Were they all cut off from benefits because the city only had 10 spots and the first 10 to get in there get the job? Well, isn't that a thing? Aren't you asking us to engage in speculation and conjecture? Not at all, Jeff, because what I'm asking you to do is say, ask the respondent to point out anywhere in the record where there was a letter, testimony, or any evidence that a job offer was actually made as opposed to an offer to apply for a position. Because we have the testimony from Ashley Pack, who said, yeah, I noticed in the letter an offer on the job. She testified she had a verbally offered him a job. She offered him the opportunity to apply. If you're setting up your own straw man, then you're knocking it down. If somebody invites you to fill out to complete the application process and the claimant doesn't do it, how is he going to get a job? Well, he did. He did. The application process was to fill out a willing and able, a letter of willing and ableness to perform a certain function. He did that. Didn't Pack testify he refused to come in and be fingerprinted? He had already been fingerprinted. So what? So what? They told him, he was told that a condition of the appointment was to get fingerprinted. So what if he'd been fingerprinted before? Well, I think that the point of that is, if that was the condition of the appointment, that he had to come in and get fingerprinted, he had already been fingerprinted. So what? Possibly couldn't be a condition. So what? She specifically testified that she told him that he had to come in to be fingerprinted if he wanted the job. It was her testimony. He said, I'm not coming in. No, he said that he wanted to go see his doctor and the city of Labrida. Oh, and his lawyer. And his lawyer, because it would be appropriate to make sure that... So why would you tell him not to be fingerprinted? Just to be obstreperous? I didn't tell him not to be fingerprinted. Then why didn't he go in and get fingerprinted if that was part of a condition of getting the watchman's job? And you're going to tell me because he'd been fingerprinted before. And I'm going to say, so what, again? Well, I think we have to start with the question of whether or not it was a job offer. If you want to say that's fine, that's a job offer, all right. I will concede that to you if you feel it's an appropriate job offer. But then let's get to the second question, which is, is it an appropriate job? Because ask the facts. There was testimony that he never would have had to confront anyone physically. The only thing he would be required to do is call the police. And so the only reason why he objected to it physically is because of physical, the possibility that he may have to physically confront someone. And the testimony was he never had to do it. That was one of the reasons. The other one was because a vocational expert who was retained by us, Jim Boyd, said, yeah, I don't think he can do the job. The guy's got a fifth percentile in reasoning. I don't think this is a job he can handle. But then we have testimony from Ashley Parker. She doesn't know his restrictions work. She didn't know if it was an appropriate job. Dan Misch didn't know the restrictions, didn't know if it was an appropriate job. The vocational expert that had been retained by the city of Chicago, he testified, he was unaware of any issues with regard to a watchman's position. He had no opinion whether or not it was an appropriate job. And he testified he was unaware of what the job duties were. And so where is the testimony, if you want to say that they offered a position, where is the testimony that that's an appropriate position? Because there isn't any in the record. And none of the witnesses that were brought by the Chicago. Didn't Misch testify that the watchman position, no aspect involved lifting over 30 pounds, no overhead lifting, and no apprehension of trespassers? He did testify to that. So that's in the record. The commission can consider it, can't they? They certainly can. It was belied by the job, the job itself. The job description itself showed that that wasn't accurate. But who's to find their effect? I don't disagree with you that they're to find their effect. But there has to be someone who says this is an appropriate job. There was none of that testimony here in this case. And after that, I don't think we can make the determination that he's not entitled to a permanent total disability. We have an individual who underwent both self-directed as well as a two-year job search with Vocational Counselor of Higher Education Chicago. He had over 1,100 job contacts, and he didn't find a job. He has a ninth-grade education. His testing showed him down in the fifth percentile for reasoning. And I think it's pretty apparent that, and I think the city was pretty apparent, they continued paying this guy maintenance benefits until nine months after this job offer supposedly took place. They continued paying him. They just decided they wanted to stop paying him. And then came in and said, hey, you're not entitled to a permanent total disability. You're only entitled to a wage differential. And it's beyond the numbers that both their Vocational Counselor as well as their own. Would you agree this is a manifest way to be evidence? I don't disagree with you there. You have a high burden to establish that their findings were clearly, that was the conclusion that's clearly apparent. I absolutely agree with you, but the question goes back to the original. If somebody offers you a job and says, hey, here's a job, we want you to go work for us, that's fine. Yeah, but that couldn't happen here, as Justice Hoffman has been alluding to for the last ten minutes. You have to start the process. If an employer says, you know, we want you to apply for the position, but you have to do X, Y, and Z first before you can offer it to you. Right. You come back and say he refuses to do Y, and therefore it's not a bona fide job offer. Exactly what you said. By the time he was ready to do that, there were no positions left. He went to go see his doctor. He came back and said, fine, I'm going to, but I'm coming in. And they said, too late. Did he need a doctor to be fingerprinted? Did he need a doctor to be fingerprinted? I don't believe so. Well, again, why didn't he do it? Well, because he wanted to talk to his doctor and see if that was an appropriate job. And whether or not he, whatever the response was from that doctor, there wasn't a job there. And so I guess the question then becomes, if he goes in on day one after he receives that letter and goes and gets fingerprinted, and they say all the jobs are gone, are we going to criticize him at that point? Do we criticize the doctor? He does everything he's requested to do to complete the application process, and he doesn't, and he does it, then you're in much more solid ground, aren't you? I don't disagree with him. We go back to the real thing. They have to offer him a job. The fact that he, to say that, well, he didn't go through that process, whether or not we agree or disagree with that, the fact of the matter is there wasn't a job offer. Counsel, we've got time on the clock. Okay. Thank you. I'll have an opportunity to address that on the clock. Yes. Counsel, you may respond. Counsel, good afternoon. My name is Joseph Rick. I represent the defendant, Appleby in this case, the city of Chicago. Counsel just asked, where is the evidence that this was an appropriate job? Pages 413 to 416 in the record, that Stephan was asked hypothetically if the plaintiff was offered a job, that a Washington position that didn't require lifting more than 30 pounds, that required monitoring the premises, watching security monitors and calling 9-1-1, there was an issue if that would be an appropriate job. And Stephan also testified that Mr. Paisano wasn't employable in person. So that's where the evidence is. Dan Misch confirmed that the job that was offered was a job that did not require lifting pounds, was a Washington position that required monitoring certain security devices and calling 9-1-1 in case of emergencies. That, in the record, is where it's clearly stated that this was an appropriate job. And as Your Honor pointed out, we're dealing with the question of manifestly the evidence against the manifestly the evidence. That aspect of that decision is clearly supported by the record. If you move on to the other burning question in this case, can the claimant receive a scheduled award of PPB benefits and also a wage differential for two accidents to the same body part? Well, the- As the commission found. And that got reversed, so. Well, correct. In the commission- So the question is twofold. Can that happen? And there are circumstances where it can happen. I believe the court addressed that in the City of Chicago case. And in the City of Chicago case, they pointed out that there was, I believe, a two-year gap between return to work and- So more than a year gap between return to work and the second accident, return to full duty employment. But there was a complete lack of evidence that there was a permanency. And the court pointed out- So the case has left open this issue, assuming you had the appropriate quantum of evidence to delineate an enforcement stance. Correct. That's what you're saying, and it didn't happen, correct? Correct. And that's why, in this particular case, the decision went through one set of statement of facts and then just made it the initial decision from the arbitrator and then just made statements with regard to the claimant. There was no explanation with regard to the 20 percent and on it. No explanation with regard to the 30 percent and. The arbitrator just said in their initial statement, 20 percent and on it, 30 percent and, without identifying any aspect of the facts that could substantiate that decision. And that's why, Judge White correctly noted, there was no discernible difference between the condition as it existed prior to December 12, 2004. That could be attributed to the second accident. Correct. On that basis, you can't get two awards for the same injury, correct? Correct. All right. This case is actually very similar to the bond robber case in another aspect, and that has to do with this third episode, which, of course, occurred during the vocational rehabilitation process, not while he was working. Nonetheless, if it's a sequelae from the original incident, and that's what brought him there, he can make a recovery from that incident. However, in this particular case, the commission clearly stated that we are relying on Dr. Cornlatt. Dr. Cornlatt stated that this was simply a death from sprain injuries. He has separately and unrelated to these incidents, a preexisting eugenic condition in the cervical spine, a preexisting eugenic condition in both shoulders. In fact, the record shows that he didn't have a prior seizure of the shoulder. So Dr. Cornlatt simply stated that as far as the suit is concerned, he had some sprain injuries, and then he's got other issues that are unrelated to the work accident. The commission clearly states that in referencing the initial decision, it states that we rely on Dr. Cornlatt and notes that any permanency with regard to this injury is awarded in the first accident. So just like the Baumgart case, there were two injuries to the knee, a third injury to the foot, and the commission declined to award any permanency on any foot case in the court note of that. Unless the commission chose or determined that there was no or was sufficient evidence to respect permanency as far as the case is concerned. So the record is clear in this case. There was a job loss. The job was a fault. It was within his restrictions. The record also shows that the claimant had ongoing restrictions related to the first injury which involved the elbow and the hand. A recurrence involved an injury to the same hand. In fact, the first doctor that saw him said he didn't see any difference between the doctor who primarily treated the hand was Dr. Nagle. And Dr. Nagle maintained the same set of restrictions both before and after that subsequent accident. So the circuit court's decision was correct. The commission's finding with regard to the waist differential was appropriate. The circuit is established by whether they correctly calculated it. Thank you. Thank you, counsel. Counsel, you may reply. I just wanted to add that the last issue would be Dr. Nagle's restrictions weren't the same. Dr. Nagle had, after the first accident, had to return him back to work. He went back to work as a hoisting engineer working on a graffiti blaster. So there was a variation between them. But with regard to that, counsel indicated that, and he went through a list of job duties to establish that this job was appropriate within the restrictions of petitioner. And this commission actually testified when they asked about the job duties. And this is on C-467. If you look at duties, does that actually reflect the duties of the Washington Department of Water? And he said certain locations you ask are different to determine which position you're at. Every location is different. And the reason why that's significant is because every location is different. And if we're going to say that a job was offered, they certainly didn't make an offer of a job at a specific location and specific duties with specific responsibilities. They never said, hey, this is the time in Washington that you're going to be working. You're going to work the third shift or the first shift or the second shift. There was no determination at all about a job offer. And certainly if there's different duties for different locations, then you would need to make that determination of what job was actually offered before you could determine if it's within his restrictions. And Mr. Misk certainly testified the opposite, that there's different duties for different locations, and none was ever offered to the petitioner. And so I would ask that you award separate decisions for the first two injuries as well as a separate decision on the third injury. Counsel indicated that this was a strength sprain. It certainly wasn't what their Section 12 examiner found. He had found that he had permanent lifting restrictions as a result of this injury, 20 pounds on his shoulders bilaterally. But when that determination was made, the petitioner was still undergoing treatment, and Dr. Kornblatt, the Section 12 examiner, he indicated that he hadn't reached MMI. So if we're going to say that it's a strain or a sprain and it was just something that arose up, he didn't make that opinion, and he didn't make that opinion at the time he was still undergoing treatment. In my brief, I also mentioned the fact that a period of time they just decided they didn't want to pay payments. And I believe that it was an error for the commission to fail to award penalties during that period of time. The respondent never made any indication on why they wouldn't pay benefits from the period of June through September. He simply didn't pay anything, paid it once we brought in item B. So I think that should have been awarded against a person with a total disability. Thank you, counsel, both for your arguments in this matter. We take them under advisement. And a writ disposition will issue.